2022 IL App (1st) 210524

No. 1-21-0524

Opinion filed January 12, 2022

Third Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| NEIL TAYLOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 L 2176 |
| | ) | |
| THE EVANGELICAL COVENANT CHURCH, | ) | Honorable |
| | ) | Thomas R. Mulroy, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE BURKE delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiff, Neil Taylor, sued defendant Evangelical Covenant Church (ECC), alleging that

he lost his position as pastor of a congregation named Jesus People USA due to defendant's slow

and careless investigation of an accusation of sexual assault against him. The circuit court

dismissed his complaint pursuant to finding that (1) the ecclesiastical abstention doctrine and the

ministerial exception barred his claims for breach of contract and intentional interference with

economic advantage and (2) he failed to adequately state those claims. On appeal, plaintiff argues

that the circuit court's dismissal of his complaint was in error. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3       Defendant ECC credentialed plaintiff as a pastor in 1989 and ordained him 15 years later

in 2004. Plaintiff served as the pastor of a congregation named Jesus People USA, which is a

member church of defendant ECC.[1]

¶ 4       In January 2017, an individual whom plaintiff and his spouse cared for as a child accused

plaintiff of sexual assault during the 1970s. Plaintiff informed defendant ECC of these

allegations. In early June 2017, defendant ECC informed plaintiff that he was suspended and not

allowed to preach, teach, or attend church. Plaintiff's suspension forced Jesus People USA to

find and employ a different pastor. In late June 2017, plaintiff met with defendant's Board of

Ordered Ministry at the church's annual meeting to discuss the allegations against him. After this

meeting, defendant upheld plaintiff's suspension. Throughout the remainder of 2017, plaintiff

frequently contacted defendant "to inquire as to the status and progress of the investigation and

when he could expect his suspension to be lifted." Defendant did not respond.

¶ 5       In April 2018, defendant asked plaintiff for permission to contact his accuser. In June

2018, plaintiff again met with the Board of Ordered Ministry at the church's annual meeting.

Defendant "acknowledged that the accusations that had been made against [plaintiff] were

malicious and that the investigation had been carelessly handled." Defendant's executive

director, Richard Lucco, wrote to plaintiff, stating that defendant lacked "care and due process"

_____

[1]Plaintiff's complaint appears to allege that he was an employee of both defendant ECC and Jesus People USA. He alleges that he had "employment with Jesus People USA" and that he "commenced and continued working for Defendants [*sic*]." ECC is the only defendant in this case. Plaintiff also alleges that he was "an employee in good standing and had, within the meaning of employment law, a contractual relationship with both defendant and its affiliated organization[ ] Jesus People USA." However, plaintiff's brief states that "it is undisputed that [plaintiff] was not an employee of ECC, but rather of the congregation at which he served."

when investigating the allegations against plaintiff. Defendant lifted plaintiff's suspension on June 27, 2018. Nevertheless, Jesus People USA "declined to reinstate [plaintiff] under the same terms and conditions of his previous employment." As of 2020, plaintiff was still "not serving in a pastoral position."

¶ 6    Defendant's bylaws, which are attached to plaintiff's complaint and part of the record on appeal, provide that the annual meeting is "the highest deliberative and decision-making body of" the church, and that "[t]here shall be one regular session of the Annual Meeting each year." The Board of Ordered Ministry, which reports to the annual meeting, "has general supervision over all ordained and licensed ministers *** including their ordination, license, commission, consecration, standing, and discipline, and the maintenance of high standards in their ministry." Defendant's Rules for the Ordered Ministry provide that a "minister *** may be charged with indiscretion, immorality, doctrinal error, unethical behavior, or disloyalty to [defendant]." The investigation of such charges

> "shall be initiated by the executive minister of the ordered ministry and the president of the ECC in consultation with the conference superintendent, the regional director, or the executive minister of [S]erve [G]lobally. These leaders shall then confer and determine the order of responsibility in pursuing the matter. They may refer the issue to the regional committee on ministerial standing or to the Board. Upon referral of charges to the Board, it shall assume responsibility to ascertain the validity of such charges and take appropriate action."

"A minister *** may be disciplined by the board" by "[t]emporary suspension of ministerial or missionary credentials and removal from ministerial functions, while charges are being

investigated." Similarly, "[i]n the case of a serious offense, a minister or missionary's credentials may be temporarily suspended…..After investigation, the Board shall determine the kind of discipline required."

¶ 7     In 2020, plaintiff sued defendant. His first amended complaint alleged the facts set out above and counts of breach of contract and intentional interference with economic advantage. The breach of contract count alleged that defendant's bylaws constituted a contract between the parties. Defendant breached that contract because, when it "completed its investigation and found no basis for the charges nor any basis for discipline, plaintiff should have been returned to his parish and prior position under the same terms as his previous employment." The intentional interference count alleged that, "[i]n conducting an unreasonably slow and ineffective investigation of allegations against plaintiff, and in keeping plaintiff in a suspended status for an unreasonably lengthy period of time, [d]efendant intentionally and maliciously interfered with plaintiff's economic expectancy and caused a breach of his employment with defendant and Jesus People USA."

¶ 8     Defendant filed a motion to dismiss plaintiff's first amended complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2020)). Defendant argued that, under the ecclesiastical abstention doctrine and the ministerial exception, the court did not have jurisdiction "to determine whether or how [defendant] followed its own rules of ministerial investigation and discipline." Defendant also argued that plaintiff failed to state claims for breach of contract and intentional interference with economic advantage. In response, plaintiff argued that the ecclesiastical abstention doctrine did not bar his claims because the court could resolve them by applying neutral principles of law to determine whether defendant

violated its own rules and bylaws. Plaintiff also contended that he adequately stated claims of breach of contract and intentional interference with economic advantage.

¶ 9     On April 15, 2021, the circuit court granted defendant's motion and dismissed the first amended complaint "in entirety *with prejudice* for the reasons stated in [defendant's] Motion to Dismiss." (Emphasis in original.) The record does not reflect the court's reasoning further.[2]

¶ 10     Plaintiff timely appealed.

¶ 11                             II. ANALYSIS

¶ 12     On appeal, plaintiff argues that the circuit court erred in granting defendant's motion to dismiss. A section 2-615 motion challenges the legal sufficiency of a complaint based on defects apparent on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). We construe the complaint's allegations in the light most favorable to the plaintiff, accept as true all well-pleaded facts, and draw all reasonable inferences in favor of the plaintiff. *Id.* Dismissal is only appropriate if it is "clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery." *Rehfield v. Diocese of Joliet*, 2021 IL 125656, ¶ 20 (not yet released for publication and subject to revision or withdrawal). Our review is *de novo* (*id.* ¶ 23), meaning that we perform the same analysis that the trial court would perform (*Khan v. Fur Keeps Animal Rescue, Inc.*, 2021 IL App (1st) 182694, ¶ 25 (not yet released for publication and subject to revision or withdrawal)).

---

[2]No reports of proceedings are included in the record on appeal. However, reports of proceedings are not necessary for effective appellate review because, under the *de novo* standard, we review the circuit court's judgment, not the reasons for its judgment. See *Makowski v. City of Naperville*, 249 Ill. App. 3d 110, 115 (1993).

¶ 13 Defendant's motion to dismiss asserted as grounds for dismissal both the ecclesiastical abstention doctrine and the ministerial exception. Both doctrines are rooted in the first amendment to the United States Constitution, which applies to the states through the fourteenth amendment. *Rehfield*, 2021 IL 125656, ¶ 36. The first amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof \*\*\*." U.S. Const., amend. I. If either the ecclesiastical abstention or the ministerial exception applies to plaintiff's claims, we must affirm the circuit court's dismissal of his complaint. See *Rehfield*, 2021 IL 125656, ¶ 37.

¶ 14 "The ecclesiastical abstention doctrine provides that 'civil courts may not determine the correctness of interpretations of canonical text or some decisions relating to government of the religious polity; rather, court must accept as given whatever the religious entity decides.' " *Id.* ¶ 39 (quoting *Duncan v. Peterson*, 408 Ill. App. 3d 911, 915 (2010)). That is,

> " 'where resolution of [a] dispute[ ] cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of a hierarchical polity, but must accept such decisions as binding on them.' " *Id.* ¶ 42 (quoting *Serbian Eastern Orthodox Diocese for the United States of America & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976)).

¶ 15 However, ecclesiastical abstention is not an absolute bar to courts deciding disputes involving religious organizations. *Id.* ¶ 43. Where neutral, objective, and well-established principles of law familiar to lawyers and judges can be applied and there is no danger of " 'entanglement in questions of religious doctrine, polity, and practice,' " the first amendment

does not bar a civil court from resolving the case. *Id.* (quoting *Jones v. Wolf*, 443 U.S. 595, 603 (1979)). Under this "neutral principles of law" approach, a court "may examine pertinent charters, constitutions, bylaws, deeds, state statutes, and any other evidence to resolve the dispute in the same way it would a secular dispute." *Id.*

¶ 16    First, we must determine the subject of this dispute. If it involves matters of discipline, faith, internal organization, or ecclesiastical rule or law, then abstention is required regardless of whether neutral principles or law could adjudicate the matter. See *Bruss v. Przybylo*, 385 Ill. App. 3d 399, 421-22 (2008). If the dispute does not involve one of these subjects, then the circuit court may hear the case only if the issues can be determined using neutral principles of law without interfering with matters of church discipline, faith, internal organization, or ecclesiastical rule, custom, or law. *Stepek v. Doe*, 392 Ill. App. 3d 739, 755 (2009); *St. Mark Coptic Orthodox Church v. Tanios*, 213 Ill. App. 3d 700, 714 (1991).

¶ 17    There is no dispute that defendant is a church and that its rules and bylaws applied to plaintiff as an ordained minister. The essence of plaintiff's complaint is that defendant's internal investigation of his alleged sexual misconduct was unreasonably slow and unfair and that he was not returned to Jesus People USA once his suspension was lifted. Plaintiff self-reported the allegations of sexual misconduct to defendant and met with defendant's Board of Ordained Ministry twice at the church's annual meetings to discuss those allegations. The Board suspended plaintiff, investigated the allegations against him between the 2017 and 2018 annual meetings, and then lifted his suspension. According to defendant's rules, the Board of Ordained Ministry had the exclusive power to investigate charges against plaintiff and take appropriate action once those charges were referred to the Board.

¶ 18    Even viewed in the light most favorable to him, plaintiff's claims arise from a wholly internal investigation and suspension conducted by his church. Plaintiff's claims are inexorably intertwined with defendant's investigation as to whether he was fit to serve as a pastor, given the accusation of sexual misconduct against him. That is, the substance of plaintiff's complaint relates to internal matters of church governance and discipline. Ecclesiastical abstention is required because this case necessarily involves matters of internal discipline. See *Bruss*, 385 Ill. App. 3d at 426. It is irrelevant whether the dispute could be resolved by a court's interpretation of defendant's bylaws because, no matter how egregiously defendant may have departed from proper investigatory procedures, the subject matter of the dispute makes abstention compulsory. See *id.* at 422.

¶ 19    We recognize that the charge of sexual misconduct against plaintiff concerned events that allegedly occurred before he became a pastor. However, public policy favors religious organizations taking allegations of sexual abuse against their clergy seriously and investigating them thoroughly, regardless of when the alleged abuse occurred. Moreover, different religious organizations may have different views regarding what constitutes fitness to serve as clergy. We cannot review such decisions without violating the first amendment by approving some views and rejecting others. Thus, because plaintiff's complaint directly challenged defendant's internal investigative and disciplinary procedures, the circuit court lacked jurisdiction and properly dismissed the case.

¶ 20    Plaintiff acknowledges that churches have an unfettered right "to establish their own rules and regulations for internal discipline and government" (*Milivojevich*, 426 U.S. at 724), but argues "that, once a religious entity *does* establish such rules and regulations, it is bound by

them." (Emphasis in original.) Essentially, plaintiff argues that we can use neutral principles of law to determine whether defendant followed its own rules and bylaws in investigating and suspending him. It is true that, in some circumstances, "a civil court may exercise jurisdiction to decide whether [a] church has violated its bylaws." *Jackson v. Mount Pisgah Missionary Baptist Church Deacon Board*, 2016 IL App (1st) 143045, ¶ 52.

¶ 21     In *Jackson*, the plaintiff pastor sued his former church, alleging breach of contract. *Id.* ¶ 5. Specifically, the plaintiff claimed that the church failed to follow four steps required by its bylaws before terminating him: (1) providing a written notice of dissatisfaction, (2) holding a special meeting, (3) providing notice of a vote to the members, and (4) having a proper membership vote. *Id.* ¶ 54. After a bench trial, the trial court found that the defendant church did not violate its bylaws. *Id.* ¶ 2. On appeal, this court held that jurisdiction was proper to review plaintiff's claims because we did not need to inquire into any religious doctrines and could address the issues by applying neutral principles of civil law to the church's bylaws. *Id.* ¶ 53. We affirmed, concluding that the defendant church did not violate its bylaws. *Id.* ¶ 78.

¶ 22     *Jackson* is distinguishable because the plaintiff's complaint identified four specific ways in which the defendant church violated its bylaws pertaining to termination of pastors. That is, the *Jackson* court only had to determine whether the defendant church took the steps required by its bylaws before terminating the plaintiff. By contrast, in this case, plaintiff's complaint does not identify specific rules or bylaws that defendant allegedly violated. Rather, plaintiff alleges that defendant's investigation was "carelessly handled," featured a "lack of care and due process," and was "unreasonably slow and ineffective" and that defendant "inadequately handled the investigation *** by not using proper efficiency, care and effort to conclude its investigation."

Defendant's bylaws and rules attached to plaintiff's complaint specify no timeframe for investigations into pastor misconduct and no standard of care for such investigations; nor do they require the return of plaintiff to his former congregation upon completion of the investigation. We cannot apply neutral principles to bylaws that are silent on such matters. To resolve plaintiff's claims, we would have to make a "searching and therefore impermissible inquiry" into defendant's internal investigation of plaintiff (see *Milivojevich*, 426 U.S. at 723) and make subjective judgments about whether that investigation was timely and fair. The first amendment prohibits us from doing so.

¶ 23     Plaintiff also cites *Jenkins v. Trinity Evangelical Lutheran Church*, 356 Ill. App. 3d 504 (2005), as "highly analogous" because "[defendant]'s actions caused the cessation of [plaintiff]'s compensation and benefits." However, *Jenkins* involved allegations that a pastor's former church breached an agreement to pay his salary and benefits for the remainder of the year in which he resigned due to accusations of sexual misconduct. *Id.* at 507. Plaintiff does not allege that defendant refused to pay him salary and benefits; rather, he claims that defendant's investigation of him was untimely and unfair. *Jenkins* is inapposite. Accordingly, we find that ecclesiastical abstention bars to plaintiff's claims, and the circuit court properly dismissed them.

¶ 24     This opinion does not give any support or credence to the position that church investigative bodies are immune from the mandatory reporting statutes or that their procedures and findings are exempt from disclosure subject to subpoena. When an investigative body of a church breaches into the area of law governed by criminal or civil liability, the resulting findings and procedures are not exempt from disclosure. This case is limited to the issue of whether the

plaintiff overcame the ecclesiastical privilege to establish a breach of contract or intentional interference with economic advantage claim. He did not.

¶ 25    Because we find that the first amendment bars secular adjudication of plaintiff's claims, we need not address whether he adequately stated claims for breach of contract and intentional interference with economic advantage.

¶ 26                                III. CONCLUSION

¶ 27    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 28    Affirmed.

---

**No. 1-21-0524**

---

| | |
|---|---|
| **Cite as:** | *Taylor v. Evangelical Covenant Church*, 2022 IL App (1st) 210524 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-L-2176; the Hon. Thomas R. Mulroy, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard J. Gonzalez, Law Offices of Chicago-Kent College of Law, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Susan Miller Overbey and Robin L. Mohr, of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellee. |

---

| | |
|---|---|
| *Amicus Curiae***:** | James C. Geoly, of Chicago, for *amicus curiae* Catholic Conference of Illinois. |

---